

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELVIN THOMAS, )
)
      Plaintiff, )
) No. 06 C 6673
vs. ) Magistrate Judge Sidney I. Schenkier
)
LINDA S. MCMAHON, )
Acting Commissioner of Social Security, )
)
      Defendant. )

### MEMORANDUM OPINION AND ORDER[1]

This is an appeal from the Social Security Administration (the "Administration") denying a claim for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") by Melvin Thomas. Mr. Thomas has filed a motion for reversal and an award of benefits (doc. # 19). Mr. Thomas's sole argument is that the administrative law judge ("ALJ") erred in finding Mr. Thomas's complaint that "his feet burn on occasion when his sugar is high" was not credible, and that this led the ALJ to erroneously find that Mr. Thomas had the residual functional capacity ("RFC") to perform certain of his prior work (Pl.'s Mem. 8-10). For its part, the Commissioner has cross-moved for affirmance of the ALJ's decision (doc. # 21). For the reasons that follow, the Court grants the Commissioner's motion and denies Mr. Thomas's motion.[2]

---

[1] On March 7, 2007, the Executive Committee reassigned this case to this Court for all proceedings, including the entry of final judgment (doc. ## 14, 17), pursuant to the parties joint consent (doc. ## 13, 16) and 28 U.S.C. § 636(c).

[2] Each party has filed a memorandum of law in support of its position (*see* doc. ## 20, 21). Under the briefing schedule set by the Court on March 27, 2007, plaintiff was allowed to file a reply memorandum by June 22, 2007. Plaintiff failed to timely file a reply or seek additional time to do so. Accordingly, on August 15, 2007, the Court treated the briefing as closed and took the matter under advisement (doc. # 22).

# I.

To establish a "disability" under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months" 42 U.S.C. § 423(d)(1)(A) (2002). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. 404.1520 (2002). Under this test, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. See 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.*

In reviewing the Commissioner's decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner (here the ALJ). *Herron*

*v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," which is defined as such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining a claimant's disability falls on the Commissioner (here the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). This Court is limited to reviewing whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992); *see also* 42 U.S.C. § 405(g). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion in the first instance. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

However, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only evidence that favors his or her ultimate decision. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the analysis must be articulated at some minimal level and must state the reason(s) for accepting or rejecting "entire lines of evidence." *Id.* The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). In particular, the ALJ must articulate specific reasons supporting a credibility determination; however, a court will not overturn the ALJ's credibility determination unless it is

"patently wrong." *Zurawski*, 245 F.3d at 887; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

## II.

We begin our analysis with a brief review of the relevant facts, as found by the ALJ based on record evidence. The argument that Mr. Thomas has raised in this case is limited to one discrete issue: the ALJ's credibility finding concerning Mr. Thomas's testimony about occasional "burning feet," and the effect of that finding on the RFC determination (Pl.'s Mem. 8-10). Thus, the factual summary below will not cover all the medical evidence in the record, but only that which is relevant to this sole issue presented on review. Any other issues, having not been raised, are waived.

### A.

Melvin Thomas was born on July 24, 1950; he has a tenth grade education. Mr. Thomas has had non-insulin dependent diabetes mellitus (Type II) since 1997 (R. 316), and uses oral medications to control this disease (R. 4). At all relevant times, he has been obese. Mr. Thomas claims that he has been disabled (*i.e.*, unable to work) since January 12, 2004 (his "onset of disability" date), as a result of a variety of conditions including arthritis, high blood pressure, chest pain, hernia, diabetes mellitus and a stroke (R. 15).

Mr. Thomas's last employment was as a security guard from June 18, 2004 through August 27, 2004 (R. 200) – all after the alleged onset date of his disability. Mr. Thomas lost that employment in August 2004, not because of an inability to discharge the physical demands of that job, but because he was discharged for allegedly cheating on his time and attendance sheet (R. 200). Prior to working as a security guard, Mr. Thomas worked as a shuttle bus driver for a security service from February 27, 2000 through January 12, 2004 (R. 189). In that job, Mr. Thomas frequently lifted

10 pounds, and was required to walk, stand, sit and climb (R. 190). Mr. Thomas says he was laid off in January 2004 (R. 395).

Prior to his job as a shuttle bus driver, Mr. Thomas worked as a driver for a temporary service from November 17, 1997 through June 12, 1999 (R. 189). In that job, Mr. Thomas frequently lifted more than 50 pounds, and was required to walk, stand, sit and climb (R. 191). Mr. Thomas also worked as a mill operator and machine operator between October 1991 and November 17, 1997 (R. 189).

**B.**

The medical evidence in the record indicates that Mr. Thomas underwent emergency room treatment on March 27, 2004, because of right great toe pain caused by an acute injury: he stubbed his right great toe against a concrete block (R. 313). At the time, Mr. Thomas also complained of pain in his left great toe after he stubbed that toe on a bed rail (R. 314). An examination showed that Mr. Thomas had a normal gait, there was no swelling to the ankle or foot, and there were normal pulses in both feet (R. 313-14). There was mild edema (swelling) and decreased sensation in the right great toe (R. 314). Right foot x-rays were negative (R. 314). The impression was right toe contusion (R. 314).

On June 1, 2004, Dr. Barry Siegel examined plaintiff (R. 316). At the time of the examination, Mr. Thomas was 5'9" tall and weighed 290 pounds (R. 317). During the examination, x-rays of the previously-stubbed great toes were normal (R. 316). Mr. Thomas complained of toe pain that was exacerbated by walking, but he also stated that his toes hurt while seated (R. 316). Mr. Thomas did not complain of burning or pain more generally in his feet.

To the contrary, Mr. Thomas told Dr. Siegel that he cooked, washed dishes, mopped, swept and vacuumed his home (R. 317); he also drove to the laundromat and grocery store, and he walked about one mile on most days for exercise (R. 317). Dr. Siegel noted that Mr. Thomas had a wide-based heel walk and toe walk, his tandem walk was mildly impaired, and his squat was normal (R. 318). There were trace reflexes in the lower extremities (R. 318); and his right foot x-rays showed sclerotic changes at the great toe (R. 318).

Dr. Siegel diagnosed Mr. Thomas with morbid obesity, Type 2 diabetes mellitus, a past history of ethanol abuse; lower extremity neuropathies secondary to diabetes and/or ethanol; mild degenerative joint disease of the right knee and great MTP joints, back pain and hypertension (R. 319). Dr. Siegel noted that Mr. Thomas was diagnosed with diabetes in 1997, and that the condition is "under good control on medication" (R. 316). Dr. Siegel stated that Mr. Thomas could lift and carry 50 pounds occasionally and stand and walk between two and six hours each work day, but he should not work with dangerous equipment or do any driving until the possibility of seizures was ruled out (R. 319).

On June 15, 2004, Dr. Robin Richard, a State Agency Examiner, performed another examination of Mr. Thomas and prepared a physical RFC analysis (R. 321-28). Dr. Richard stated that Mr. Thomas could occasionally lift 50 pounds and frequently could lift 25 pounds; stand, walk and/or sit six hours in any eight-hour work day; had no limits in his ability to push, pull, balance, stoop, kneel or crouch; could occasionally crawl; and should never climb ropes or scaffolds (R. 322-23). Dr. Richard also said Mr. Thomas should avoid concentrated exposure to hazards, such as heights (*Id.* at 326).

On July 11, 2005, Mr. Thomas was admitted to Provena Mercy Hospital with complaints of chest pain and dizziness (R. 370). The next day, July 12, Mr. Thomas underwent a heart catheterization and implantation of a stint (R. 341). On July 19, 2005, Mr. Thomas took a stress echocardiogram, in which he achieved a work level of 9.7 METS (R. 337).[3] The report of that test stated that Mr. Thomas had "normal exercise tolerance," "no complaints of chest pain," and that the results of his test were "normal" (*Id.*).

## C.

The administrative hearing was held on February 9, 2006. Mr. Thomas testified that his daily activities included walking in his neighborhood (about one block), sitting for five to ten minutes at a time, and lifting 10 pounds (R. 405, 408, 410).[4] He also cooks, does dishes, grocery shops, uses the phone, reads, watches television, naps, and takes care of his personal hygiene (R. 407, 410, 418).

Mr. Thomas testified that his condition had worsened during the previous year (R. 417). Mr. Thomas said that he experiences pain "maybe every two days" when he tries to stand or walk (R. 406). Specifically, he said he feels pain in his right hip down to his right foot, which becomes worse when the weather is damp or with any activity (R. 406, 416). He sleeps poorly as a result, but lays down for pain relief (*Id.* at 411). He seldom uses a cane (R. 417). He said that the pain had become more frequent and more limiting in the year prior to the hearing. For pain relief, he takes two Ibuprofen (*Id.* at 416-17).

---

[3]Dr. James McKenna, the medical expert, testified at hearing that a 9.7 score is "quite a high level," showing conditioning better than that of most persons (R. 422).

[4]During his consultative examination on June 1, 2004, Mr. Thomas had told Dr. Siegel that he walked one mile a day for exercise (R. 317).

7

Mr. Thomas also testified that he takes non-insulin medications to help him keep his blood sugar down and thus control his diabetes (R. 399). Mr. Thomas said that his diabetes causes him to experience burning and pain in his feet and toes; both left and right (R. 401). Mr. Thomas described this as a condition that "comes and goes" as long as he keeps up with his medication (*Id.*).

The ALJ then received testimony from Dr. James McKenna, a medical expert ("ME"). Dr. McKenna testified that Mr. Thomas has non-insulin dependent (Type II) diabetes, controlled well by his oral medications, with no end-organ damage (R. 421, 427-29). Dr. McKenna testified that Mr. Thomas's claims of fatigue and the need for naps was inconsistent with the objective evidence of the score he obtained on the stress test (9.7 METS), which showed a good level of conditioning (R. 422-23). Dr. McKenna testified that with Mr. Thomas's METS level and the other medical evidence, he could see no problem with Mr. Thomas lifting 50 pounds occasionally (R. 424-25).

Dr. McKenna also testified that in patients who are obese, as is Mr. Thomas, the body is more resistant to insulin (R. 428). Thus, although severe Type II patients do take insulin, Mr. Thomas was required to take oral medicines due to his obesity, such as Glucophage (R. 429). Dr. McKenna testified that Mr. Thomas's other conditions, including obesity, hypertension and arthritis, somewhat affect his ability to stand and walk, but not to the extent that Mr. Thomas would be limited to sedentary work (R. 425). Dr. McKenna opined that Mr. Thomas "could handle" six hours of standing and walking during a work day (*Id.*).

Mr. Thomas's counsel then examined Dr. McKenna about, among other things, Mr. Thomas's testimony that he feels burning sensations in his feet due to high blood sugar levels. Dr. McKenna explained that Mr. Thomas did not have the kind of medical history to support a claim of intermittent burning feet: "[e]ither you have burning feet or you don't have burning feet" (R. 430).

8

Dr. McKenna testified that a burning sensation in the feet is "not something that is related necessarily to your blood sugar and it doesn't come and go like that" (*Id.*). There is no medical evidence in the record that Mr. Thomas has identified as inconsistent with this opinion.

### C.

In his written opinion, the ALJ found that Mr. Thomas is not disabled at Step 4 because he has the RFC for medium work, and thus can still perform his past relevant work as a shuttle bus driver (R. 17). With respect to the single issue on review (the credibility of Mr. Thomas's testimony about burning feet), the ALJ found as follows.

Based on the ME's opinion, the ALJ found that "the claimant's testimony regarding burning feet was not medically accurate, since that condition is one 'you either have or don't have'" (R. 16). The ALJ also stated that the ME did not find Mr. Thomas's testimony regarding the ebb and flow of his burning sensations to be "credible" (R. 15). Because the "medical records [did] not report any diabetic or hypertensive end-organ damage," the ALJ gave great weight to the ME's opinion, which was consistent with the agency consultative examination reports indicating that Mr. Thomas retained the RFC for medium work (R. 16). The medical evidence submitted by Mr. Thomas's counsel subsequent to the hearing (*i.e.,* treatment records from July 11, 2005 to January 17, 2006) did not provide any evidence contrary to the opinions rendered by the ME.

Thus, the ALJ found that Mr. Thomas could not be exposed to extreme cold but had an RFC that allowed him to lift/carry 50 pounds occasionally and 25 pounds frequently; to stand/walk for at least six hours in an eight-hour day; to push/pull consistent with his lifting capabilities (R. 16). Based on this RFC, the ALJ found that Mr. Thomas could perform past relevant work as a shuttle bus driver, and thus was not disabled at Step 4 (R. 17).

## III.

The single issue presented for review by Mr. Thomas is stated in his brief as follows:

> Whether the ALJ erred in finding that the Claimant could perform his past RFC of medium work by adopting the ME's findings that the Claimant lacked credibility for stating his feet burn on occasion when his sugar is high and not all the time?

(Pl.'s Mem. at 1, 8). At the threshold, we note that Mr. Thomas's reference to high blood sugar pinpoints the source of his argument as one challenging the ALJ's findings regarding the effects of his diabetes mellitus, and not any of his other claimed impairments (such as arthritis or hypertension). In finding that Mr. Thomas's testimony about suffering from intermittent burning feet depending on blood sugar levels was not credible, the ALJ relied upon the testimony of the ME (R. 16). We thus consider whether the ME's opinion regarding Mr. Thomas's testimony concerning burning feet, and its relationship to his blood sugar level, was one on which the ALJ could validly base his Step 4 RFC finding. The Court concludes that it was.

Mr. Thomas's lead – and only argument – is that the ME's testimony was medically incorrect, based upon a citation in a medical encyclopedia (Pl.'s Mem. at 10, citing Medical Encyclopedia: Diabetic Neuropathy, National Library of Medicine) (Source: www.nlm.nih.gov/medlineplus/ency/article/000693.htm). Mr. Thomas cites this encyclopedia for the proposition that "intermittent pain in the feet of diabetics is not uncommon when a complication known as *Diabetic Neuropathy* exists" (*Id.*).

At the threshold, we note that Mr. Thomas's attorney did not use this definition to cross-examine the ME, and he did not bring it to the ALJ's attention at the hearing or in any post-hearing submission. Thus, the ME's testimony was uncontradicted by other medical evidence in the record. If the ALJ had rejected the uncontradicted opinion of the ME, he would have had to have "clean and

convincing reasons," which were "supported by substantial evidence." *See Bayliss v. Barnhardt*, 427 F.3d 1211, 1216 (9th Cir. 2005). Here, Mr. Thomas offered no medical evidence to contradict the ME or provide substantial evidence for not relying of the ME's opinion. We therefore conclude that the definition provided by plaintiff (belatedly) does not demonstrate that the ALJ lacked substantial evidence for his Step 4 determination.

We further note that Dr. Siegel diagnosed Mr. Thomas with "lower extremity neuropathies secondary to diabetes and/or ethanol" (which Mr. Thomas in the past had abused) (R. 319). Unlike diabetic neuropathy, neuropathy secondary to drugs is "a loss of sensation (or movement) in a part of the body due to a certain medicine." Medical Encyclopedia, Neuropathy Secondary to Drugs, National Library of Medicine (Source: www.nlm.nih.gov/medlineplus/ency/article/000700.htm). To the extent that Dr. Siegel was attributing any neuropathy to the ethanol use, the symptoms of loss of sensation or movement in the feet is inconsistent with the burning (which, if anything, is the intensification of sensation) that Mr. Thomas described during his testimony.

Moreover, the very dictionary source cited by plaintiff describes diabetic neuropathy as condition that occurs in approximately 50 percent of persons with diabetes; that when the condition occurs, symptoms begin about 10-20 years after diabetes is diagnosed; and that the condition is more likely to develop if blood sugar levels are not well controlled. Here, Mr. Thomas was first diagnosed with diabetes in 1997, about seven years before Dr. Siegel examined him. The evidence is that Mr. Thomas's diabetes has always been well controlled, which makes it less likely that he would develop nerve injuries in his feet. During Dr. Siegel's June 2004 examination, Mr. Thomas did not complain of burning or tingling in his feet, and Dr. Siegel's report did not state that Mr. Thomas experienced those symptoms. Moreover, Mr. Thomas's counsel has not pointed to any medical records between

June 2004 and the February 2006 hearing (or any subsequent ones, for that matter) documenting that Mr. Thomas was experiencing those symptoms. This evidence supports the ME's testimony that Mr. Thomas's history failed to support his claim of intermittent burning in his feet, and thus the ALJ's reliance on that testimony in deciding that Mr. Thomas's testimony about intermittent foot pain was not credible was not "patently wrong." *Zurawski*, 245 F.3d at 887.

Finally, there is other evidence of record to support the ALJ's determination that Mr. Thomas has the RFC to perform medium work. During the June 2004 examination, Mr. Thomas told Dr. Siegel that he walked a mile each day for exercise (R. 317). There is no medical evidence to support Mr. Thomas's testimony during the February 2006 hearing that he could not walk more than one block or so, and that his condition has worsened during the previous year. To the contrary, a stress echocardiogram in July 2005 showed that he had normal exercise tolerance (R. 337), and showed a level of conditioning that was better than that of most people (R. 422).

At bottom, plaintiff's argument that pain in his feet precludes him from performing his prior work is contradicted not just by the ME's testimony, but by the other medical evidence: (1) the opinion of Dr. Siegel, who found that Mr. Thomas's various conditions (including neuropathy) did not preclude him from being able to walk and stand between two and six hours a day (R. 319), and (2) the opinion of Dr. Richard, who agreed with Dr. Siegel (*Id.* at 322). The record thus contains substantial evidence to support the ALJ's Step 4 determination that Mr. Thomas has the RFC to perform his prior work as a shuttle bus driver.[5]

---

[5] The Court notes that in his concluding paragraph seeking relief, Mr. Thomas asks the Court to base reversal on "Grid Rule 202.02." Plaintiff does not develop this argument or offer authority to support it; accordingly, we find that this argument has been waived. In any event, we note that Grid – or what is known as a medical "vocational" – Rule 202.02 "applies if the claimant is capable of performing only light work." *See Heston v. Commissioner of Social Sec.*, 245 F.3d 528, 537 (6th Cir. 2001). Here, the Court has concluded that the ALJ's RFC determination for medium work is supported by substantial evidence. Thus a rule relevant to "light work" is irrelevant. Moreover, the "grids" are only

## CONCLUSION

For the foregoing reasons, the Court grants the Commissioner's motion for affirmance (doc. # 21) and denies Mr. Thomas's motion for reversal (doc. # 19). This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: November 21, 2007**

---

used at Step 5, if the ALJ determines that a plaintiff is incapable of performing past relevant work. Here, the ALJ's denial of benefits is based on a Step 4 determination.